UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED

00 NOV 17 AM 10: 50

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| TOTAL CARE MANAGEMENT, INC. | ) | |
| | ) | |
|     Debtor, | ) | |
| | ) | **ENTERED** |
| UNSECURED CREDITORS COMMITTEE | ) | |
| OF TOTAL CARE MANAGEMENT, | ) | NOV 17 2000 |
| INC., | ) | |
| | ) | |
|     Plaintiff/Appellant, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-99-S-3227-NE |
| | ) | |
| STEPHAN HOLDEN and | ) | |
| RSN INVESTMENTS, INC., | ) | |
| | ) | |
|     Defendants/Appellees. | ) | |

### MEMORANDUM OPINION

This action is on appeal from a judgement entered by the United States Bankruptcy Court for the Northern District of Alabama. Jurisdiction is predicated upon 28 U.S.C. § 158.[1] Upon consideration of the record, briefs, and documents submitted by the parties, this court affirms.

### I. STANDARD OF REVIEW

A bankruptcy court's factual findings shall be upheld on appeal, unless clearly erroneous. *See* Fed. R. Bankr. P. 8013;

---

[1] 28 U.S.C. § 158 provides that district courts "shall have jurisdiction to hear appeals from final judgments, orders, and decrees ... of bankruptcy judges.... An appeal under this subsection shall be taken only to the district court for the judicial district in which the bankruptcy judge is serving."

*Amsouth Bank v. Hartman (In re Downtown Properties, Ltd.)*, 794 F.2d 647, 651 (11th Cir. 1986).  "A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court on entire evidence is left with the definite and firm conviction that a mistake has been committed."  *Southerland v. Milam*, 187 B.R. 740, 741 (M.D. Fla. 1995) (citing *United States v. U.S. Gypsum*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).

On the other hand, a bankruptcy court's legal conclusions are subjected to *de novo* review. *See Nordberg v. Arab Banking Corp.*, 904 F.2d 588, 593 (11th Cir. 1990).  "The district court is to independently examine the law and draw its own conclusions after applying the law to the facts." *Prestwood v. United States*, 185 B.R. 358, 360 (M.D. Ala. 1995).  "On an appeal the district court ... may affirm, modify, or reverse a bankruptcy's judge's judgment, order, or decree or remand with instructions for further proceedings." Fed. R. Bankr. P. 8013.

## II. BACKGROUND

In the fall of 1996, Tommy Cary, a pharmacist ("Cary"), and Noble Thompson, a former hospital administrator ("Thompson"), learned of an opportunity to bid on a contract with the State of Alabama's Department of Veterans' Affairs ("SDVA") for the

2

management of the Floyd E. "Tut" Fann Veterans' home in Huntsville, Alabama. Cary and Thompson lacked experience in managing veterans' homes, as well as the ability to secure financing for such an undertaking. They accordingly met with Bryson Hill ("Hill") — who had prior experience in managing nursing homes and the ability to obtain the necessary financing — and offered him a 50% equity interest in the venture.

On November 20, 1996, Total Care Management, L.L.C. ("the LLC") was formed by Thompson, Carey, and Hill (collectively referred to herein as the "Principals") for the purpose of procuring and performing the contract with the SDVA.[2] The Principals' respective interests in the LLC were as follows: Hill 50%, Thompson 25%, and Carey 25%.

The LLC's bid for management of the "Tut" Fann Veterans' Home eventually was amended to include a proposal to the SDVA for management of two additional veterans' homes, one located in Bay Minnette, and the other in Alexander City, Alabama. The LLC's proposed compensation for management of each home was to be computed at the rate of $79.56 per occupant per day.

In November or December of 1996, Hill traveled to Missouri,

---

[2] According to Hill, the Principals contributed no capital to the LLC. Appendix to appellees' brief, Exhibit 3 (Hill deposition), at 19-20.

3

where he met with a business acquaintance, defendant/appellee Steve Holden ("Holden").   Holden is the majority shareholder and an officer of defendant/appellee RSN Investments, Inc. ("RSN").   Hill requested the assistance of Holden and RSN in obtaining operating capital for the LLC's venture.

Hill persuaded Holden that the venture was a good business opportunity, and that the LLC's proposed contract rate was sufficient to operate the veterans' homes.   Hill also told Holden that each of the Principals was willing to personally guarantee any operating loans procured or advanced by Holden and RSN.

In mid-December of 1996, Holden traveled to Huntsville, Alabama, to meet with the Principals.   An agreement was reached: Holden, acting on behalf of RSN, would assist the Principals in obtaining operating loans and a performance bond for the venture, in exchange for a consulting fee payable to RSN, and to be computed at the rate of $1 per licensed patient bed per day.   It also was agreed that RSN would make an interim operating loan in the amount of $60,000.

Holden learned at some point, however, apparently during the course of this mid-December 1996 meeting in Huntsville,[3] that the

_____

[3] The record does not reflect the exact date that Holden became aware of this. Clearly, it must have been after the November 1996 meeting Holden had with

4

Principals were no longer willing to personally guarantee any loans or financing arrangements that Holden found for them.  As a result, it was agreed by the parties that Cary and Thompson would allow Holden to hold their respective ownership interests in the joint venture as security.   In furtherance of that agreement, the Principals also agreed with Holden to structure the venture as a corporation, rather than an LLC, so that stock certificates evidencing the Principals' respective ownership interests could be held by Holden, pending the release of Holden and RSN from any loans and performance bonds arranged.[4]

Furthermore, the parties agreed that any contract awarded by the SDVA to the LLC would be assigned to the (yet-to-be-formed) corporation, so that Holden could hold, as security, the stock certificates representing the respective equity interests of Carey and Thompson.   Following this December 1996 meeting, Holden

---

Hill in Missouri, where Hill informed Holden that the Principals were willing to personally guarantee any operating loans procured.

[4] During his deposition, Holden explained that, unlike a corporation, a membership interest in an LLC is uncertificated.

I wasn't comfortable dealing with an LLC.  I wanted to deal with a company that had stock certificates that could be held to make sure that the collateral didn't go running away.  So I suggested to them that if I were going to get involved, they were going to do it as a corporation; and they agreed to do that.

Plaintiff's appendix to motion for summary judgment, Exhibit 1 (Holden deposition), at 69.

returned to Missouri.

On December 23, 1996, Total Care Management, L.L.C., was awarded the SDVA contract.  The SDVA agreed to pay the LLC a fee at the rate of $79.56 per occupant per day.  Significantly, however, the contract prohibited assignment of the LLC's rights, duties, and responsibilities without the prior consent and written approval of the SDVA.[5]

One week after the LLC was awarded the SDVA contract, the Principals, pursuant to their agreement with Holden, filed articles of incorporation for an entity known as "Total Care Management, Inc." ("the Debtor"), and the corporate stock of Cary and Thompson was issued directly to Holden.  The Debtor's initial officers were listed as Carey, President, Thompson as Vice-President, and Hill as Secretary/Treasurer.  The Debtor's articles of incorporation named the Principals and Holden as directors of the corporation.  Despite this fact, Holden had no involvement in the day-to-day operations

---

[5] The contract terms relating to assignment were as follows:

Except as delineated in this contract, Contractor is prohibited from subcontracting, assigning, transferring, conveying, subletting, or otherwise disposing of this agreement or its right, title or interest herein or its power to execute such agreement to any other person, company or corporations without the previous consent and written approval of the SDVAB.

Defendants' appendix to motion for summary judgment, Exhibit 1C (contract with SDVA), at 18.

of the Debtor, he never visited any of the three nursing homes, he did not act in the capacity of a director or shareholder,[6] and he did not otherwise exercise control over the Debtor or its day-to-day business operations.    Moreover, Holden did not attend any meetings of the corporation's shareholders or directors, and he had no conversations with either Cary or Thompson (aside from meeting with them in Huntsville, Alabama during December of 1996).

Four instruments memorializing the parties' prior verbal agreements — a promissory note, a pledge agreement, a consulting agreement, and a stock transfer agreement — were executed on December 31, 1996.   The promissory note was signed by Hill on behalf of both the LLC and the Debtor.[7]  In it, the Debtor promised to pay, upon demand, $60,000 in favor of RSN in consideration of RSN's interim operating loan in the same amount given on this date.

A consulting agreement was executed in favor of RSN by the LLC and the Debtor, by the terms of which it was agreed that RSN would be paid a fee of $1 per licensed patient bed per day.   In exchange for such consideration, RSN agreed:

a)   to provide advice to the MANAGEMENT COMPANY
      [defined in the preamble as the LLC and the Debtor]

---

[6] Holden did sign the minutes of the First Meeting of the Directors; however, he was not present at the meeting.

[7] Appendix to appellees' brief, Exhibit 5 (promissory note).

7

in their relations with the [SDVA];

b)   to provide advice and consult with the MANAGEMENT
     COMPANY in connection with obtaining operating
     loans from various banks and matters incident to
     the financial structure of the MANAGEMENT COMPANY;

c)   to provide such collateral and equity support as
     may in the Consultant's [RSN's] sole discretion be
     reasonable   to   procure   operating   loans   and
     performance bonds as may from time to time be
     necessary for the operation of the MANAGEMENT
     COMPANY in a prudent manner.[8]

A pledge agreement was executed by Hill, whereby he pledged

his stock in the Debtor (50%) to Holden

     as security for the prompt payment and performance by the
     Corporation of the Consulting Agreement and as Guaranty
     for the prompt performance by the Corporation of its
     Contract with the State of Alabama in such a manner to
     avoid any liability under the Performance Bond issued by
     the Insurance Company.[9]

Finally, a stock transfer agreement was executed by the

Principals and Holden, wherein it was agreed that Holden would hold

the stock of Carey and Thompson in the Debtor until such time as

Holden received releases from the operating loans he obtained on

behalf of the venture.[10]  According to the terms of the agreement,

---

[8] Id., Exhibit 8 (consulting agreement).

[9] Id., Exhibit 6 (pledge agreement).

[10] More specifically, the agreement provided that Holden would hold the
stock of Cary and Thompson in the Debtor, but "with the understanding that [such
shares were] to be transferred at closing to" Thompson and Carey.  "Closing"
would occur when Holden was released from all of Debtor's operating loans,

Holden promised, among other things, to "provide assistance" to the Debtor "to enable it to qualify for operating loans ... in a minimum amount of $350,000," and to "provide assistance to enable the corporation to make a performance bond to the State of Alabama ... [as] required under the contract [with the SDVA]."[11]   In exchange, the Principals agreed, among other things:  to cause the LLC's contract with the SDVA to be transferred to the Debtor; to use their best efforts to cause the SDVA to continue the contract with the Debtor; to maintain good relations with the SDVA; and to cause the Debtor to abide by the consulting agreement and its other contractual obligations.

On January 1, 1997, the LLC — not the Debtor, as previously agreed by the Principals and Holden — began managing the nursing homes.[12]  The day-to-day operations of the LLC (and, thereby, the three nursing homes) were managed by Hill through his company, Southern Health Management, Inc.[13]  Holden, however, was under the

---

released from liability on any indemnity agreements made with insurance companies to secure a performance bond, and received assurances that Debtor would continue to comply with its fee obligations to RSN, under the consulting agreement. *Id.*, Exhibit 7 (stock transfer agreement).

[11] *Id.*

[12] Payroll and operating accounts were opened at Union Planters Bank in Huntsville, in the name of the LLC and not the Debtor.

[13] Despite the fact that Cary and Thompson had full time jobs elsewhere, and were not involved in the day-to-day management of either the LLC or any of

impression that the LLC's management contract with the SDVA had been assigned by the Principals to the Debtor, and he (on behalf of RSN) began meeting with potential lenders to secure additional financing for the Debtor.  Moreover, on February 21, 1997, Holden caused RSN to make another operating loan to the Debtor in the amount of $100,000.  In addition, Holden and RSN guaranteed performance bonds in favor of the SDVA in excess of $2,300,000.

During the months of January, February, and March of 1997, the LLC — not the Debtor — paid RSN consulting fees in the amount of $39,153.56, pursuant to the terms of the consulting agreement.

It was not until April 1, 1997, that the Principals made an attempt to assign the LLC's contract with the SDVA to the Debtor.[14] They executed a document entitled "Assignment of State Veterans Home Management Contract."  The Principals failed, however, to obtain written approval for the assignment from the SDVA, as required under the terms of the LLC's management contract.  On

the nursing homes, they began drawing a annual salaries in the amount of $75,000 each.

[14] According to Hill, the reason for this delay was that:

[Cary and Thompson] wanted to keep it as an LLC.  Everyone had agreed before Mr. Holden advanced any money that it would be a corporation, and it took some time to convince everyone that [Holden] was serious about the corporation.

Plaintiff's appendix to motion for summary judgment, Exhibit 6 (Hill deposition), at 46.

April 2, 1997, the Principals executed another document dissolving the LLC "effective April 1, 1997."[15]  The Principals continued to use the same bank accounts created for the LLC, however, by simply changing the name on the account to that of the Debtor.

By May of 1997, it became clear that the Principals had grossly underestimated the cost of operating three veterans' homes, and the venture was suffering severe financial difficulties. Moreover, numerous violations of State Health Department standards had been discovered at the veterans' homes.[16]

No payments were made to RSN pursuant to the consulting agreement during the months of April or May, 1997.  On May 15, 1997, RSN sent a letter to the Principals, demanding that defaults under the consulting fee agreement be cured, and threatening to foreclose on the Principals' stock in the Debtor.[17]

Due to the lack of sufficient funds to finance the day-to-day operating expenses of three nursing homes, the Principals asked the SDVA to consider a rate increase in the amount of $15 per occupant per day.  If granted, this request would have raised the rate under

---

[15] *Id.*, Exhibit 2 (consent to dissolve LLC).

[16] Appendix to appellees' brief, Exhibit 1 (Wilkes affidavit), ¶ 9.

[17] The Bankruptcy Court determined there was no evidence indicating that Holden ever foreclosed on the stock, or otherwise controlled the Debtor through use of the Principals' stock.

the management contract to a total of $94.56 per occupant per day. The SDVA met with the Principals on June 12, 1997, to discuss that request, but it ultimately was denied.

By June of 1997, the numerous violations of health standards cited by the State Health Department had not been cured.  On June 26, 1997, the SDVA terminated the management contract.  The termination letter from the SDVA was addressed to the LLC (rather than the Debtor), and confirmed that the LLC's purported assignment of the management contract to the Debtor was never approved by the SDVA.  Upon termination of the contract, the Debtor ceased business operations.

Upon learning of the SDVA's termination of the management contract, RSN demanded repayment of the total amount of $160,000 it had advanced as loans.  Hill complied with this request on July 10, 1997, and forwarded a check in the amount of $160,000, drawn on the account at Union Planters Bank, to RSN.[18]

Finally, on May 21, 1998, Cary, as president of the Debtor, filed a petition under Chapter 11 of the Bankruptcy Code on the

---

[18] Hill testified that there was some dispute among the Principals regarding whether the $160,000 in loan repayments should be made to RSN. Apparently, the Principals had concerns regarding their personal liability to the IRS for unpaid payroll taxes owed by the Debtor, and that the Debtor would not have enough money to pay those taxes if RSN was paid in full. Plaintiff's appendix to motion for summary judgment, Exhibit 6 (Hill deposition), at 83-84.

12

Debtor's behalf.  The Bankruptcy Court found that Holden was not consulted by Cary or the other Principals regarding the filing, nor did Holden consent to commencement of the Debtor's bankruptcy proceeding.  According to Cary, "it wasn't my belief that his consent was necessary."[19]  In fact, Cary, who admitted to being worried about his personal liability for unpaid payroll taxes, testified that the Principals were urgently trying to file the petition before the expiration of the "one year period"[20] —— the period of time allowable under the Bankruptcy Code for a trustee to avoid a preferential transfer.[21]

After the petition was filed, plaintiff/appellant —— the Unsecured Creditors Committee of Total Care Management, Inc.[22] —— initiated an adversary proceeding against Holden and RSN seeking to avoid payment of consulting fees in the amount of $39,153.56, and also sought return of the $160,000 in loan proceeds repaid to RSN on July 10, 1997.

The Bankruptcy Court entered summary judgment in favor of

---

[19] Appendix to appellees' brief, Exhibit 2 (Carey deposition), at 54.

[20] *Id.*, Exhibit 10 (Carey statement).

[21] *See* 11 U.S.C. § 547(b)(4)(A-B).

[22] An unsecured creditor's committee is composed of representatives of creditors in Chapter 11 cases.  The committee consults with the trustee, investigates the debtor, and makes recommendations on plan acceptance or rejection to the creditors represented.  11 U.S.C. § 1103.

Holden and RSN on all counts of plaintiff's complaint on October 14, 1999.  Plaintiff now has appealed the Bankruptcy Court's entry of summary judgment on Counts I, III, V, and VI of its complaint. Plaintiff urges this court to find:  that repayment of $160,000 in loan proceeds to RSN was a preferential transfer (and, hence, is avoidable) under 11 U.S.C. § 547; that payment of $39,153.56 in consulting fees to RSN under the consulting agreement constituted a fraudulent conveyance under Alabama Code § 8-9A-5 (1975); that Holden breached a contract promising to lend working capital to the Debtor; and that Holden, as an alleged director of the Debtor, owed (and breached) fiduciary duties to the Debtor's unsecured creditors.

### III. DISCUSSION

**A.   Appellees' Motion to Strike Part II of Appellant's Reply Brief**

Before proceeding to the parties' substantive arguments, the court must first address defendants' motion to strike a portion of appellant's reply brief (doc. no. 6).  Part II of that brief asserts an argument that was not presented in appellant's initial brief: that is, the consulting fee payments to RSN were fraudulent conveyances under Alabama Code § 8-9A-4(b).

The Eleventh Circuit "does not address arguments raised for the first time in a reply brief." *Hall v. Coram Healthcare Corp.*,

157 F.3d 1286, 1290 (11th Cir. 1998); *see also United States v. Martinez*, 83 F.3d 371, 377 n. 6 (11th Cir. 1996) (stating the court refuses to consider arguments raised for the first time in a reply brief; 4 C.J.S. *Appeal and Error* § 612 (1993) ("Appellant's briefs must specifically point out the alleged errors which entitle him to a reversal, and generally only errors so pointed out will be considered on appeal.").

> [P]oints raised by appellant or plaintiff in error in his reply brief, which were not presented in the opening brief, are generally regarded as waived, and will not, as a rule, be considered by the appellate court.... A reply brief should only reply to arguments presented in appellee's brief.

4 C.J.S. *Appeal and Error* § 619 (1993). This court, accordingly determines that the argument based on Alabama Code § 8-9A-4(b) has been waived, and that appellees' motion to strike part II of appellant's reply brief is due to be granted.

**B.   Appellant's Points of Appeal**

**1.   Were Holden and RSN contractually obligated to loan the Debtor $350,000?**

Plaintiff alleges that Holden and RSN breached contracts obligating them to make loans to the Debtor in the aggregate amount of $350,000. On this point the Bankruptcy Court concluded that:

> [t]he defendants have not breached the Stock Transfer Agreement to the extent that it required Holden to

"provide assistance to [the Debtor] to enable it to qualify for operating loans or loan in a minimum amount of $350,000," or the Consulting Agreement to the extent that it required RSN to "provide advice and consult with [the Debtor and the LLC] in connection with obtaining operating loans from various banks and matters incident to the financial structure of [the Debtor and the LLC]." [23]

Moreover, the Bankruptcy Court found that any breach of an alleged verbal agreement to make loans to Debtor was barred by Alabama's statute of frauds, Alabama Code § 8-9-2(7).

This court concludes there is no basis to interpret either the stock transfer agreement or the consulting fee agreement as imposing a duty on Holden or RSN to loan monies to Debtor. The plain language of these agreements indicates that defendants agreed to provide only advice and assistance to the Debtor "to enable it to qualify for operating" loans, and, to consult with the debtor in "connection with obtaining operating from various banks." The interpretation urged by plaintiff is unreasonable. "Where language has a generally prevailing meaning, [a contract] is interpreted in accordance with that meaning." *Restatement (Second) of Contracts* § 202(3)(a) (1981).

---

[23] Final Judgment of Bankruptcy Court, at 9 (¶ 12).

16

2.   **Did the consulting fee payments to RSN constitute a fraudulent conveyance under Alabama Code § 8-9A-5?**

Plaintiff next argues that the consulting fee payments made to RSN constituted fraudulent transfers under state law and, thus, can be set aside in bankruptcy.  Under 11 U.S.C. § 544(b)(1), transfers that violate state fraudulent transfer laws are avoidable in bankruptcy.   The applicable state law provision that plaintiff relies on is Alabama Code § 8-9A-5, which provides that:

(a)   A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer.

(b)   A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt and the debtor was insolvent at that time and the insider had reasonable cause to believe that the debtor was insolvent.

Despite plaintiff's reference to subsection (b), the court finds that it is clearly inapplicable, because the consulting fee payments were not made within the one year statute of limitations period that applies to this subsection.[24]

----

[24] Alabama Code § 8-9A-9(5) provides:

A claim for relief with respect to a fraudulent transfer under this chapter is extinguished unless action is brought:

### a.   Was the transfer made by the Debtor?

Both subsections (a) and (b) of Alabama Code § 8-9A-5 apply only to transfers "made by a debtor."  The Bankruptcy Court concluded that the consulting fees were paid by the LLC, not the Debtor.

The Alabama Supreme Court has observed that a conveyance is not fraudulent merely because it frustrates a creditor, and that "even a liberal construction of [§ 8-9A-5] requires some demonstration that the <u>debtor</u> has put his property beyond the reach of a creditor." *Folmar & Associates v. Holberg*, 2000 WL 1073722, at *5 (Aug. 4, 2000 Ala.) (emphasis added).  "[T]he Alabama Fraudulent Transfer Act, by its plain language, does not apply to claims against third-party transferors." *Id.*

Plaintiff has cited no cases where an avoidance of a transfer was permitted when that transfer was not made by the debtor.  The evidence in this case reveals that the consulting fee payments were made by the LLC, by means of checks drawn on the bank account opened by the LLC.[25]  The Debtor never made any consulting fee

----

. . . .

Under Section 8-9A-5(b), within one year after the transfer was made.

[25] Plaintiff's appendix to motion for summary judgment, Exhibit 2 (check history report).

18

payments to defendants.    Therefore, plaintiff has failed to
establish the first requirement of § 8-9A-5(a) and (b).

### b.    Did creditors of the Debtor have claims existing before the transfer?

The Bankruptcy Court determined that the Debtor had no
"present creditors" at the time the consulting fee payments were
made to RSN.   The undisputed testimony of Cary indicates that the
Debtor did not transact any business, nor did it have any debts
(other than to Holden and RSN) prior to April 1, 1997.[26]   The last
consulting fee payment to RSN was tendered in a check from the LLC
dated March 19, 1997.   At that time, all liabilities were owed by
the LLC, not the Debtor.   Thus, plaintiff has failed to establish
that there existed defrauded creditors of the Debtor, whose claims
arose prior to the time the transfer was made.

### c.    Were the consulting services and consulting fees of reasonably equivalent value?

Plaintiff also contends that the payments made representing
consulting fees were not given in exchange for services of
reasonably equivalent value.   In fraudulent transfer actions, what
constitutes a reasonably equivalent value is a question of fact
and, thus, the Bankruptcy Court's decision on this point will be

---

[26] Appendix to appellees' brief, Exhibit 2, (Carey deposition), at 30.

19

disturbed only if clearly erroneous.  *Nordberg v. Arab Banking Corp.* (*In Re Chase & Sanborn Corp.*), 904 F.2d 588, 593 (11th Cir. 1990).

Nowhere in Alabama's Fraudulent Transfer Act is the phrase "reasonably equivalent value" expressly defined.[27]   When interpreting similarly phrased fraudulent transfer provisions, other courts have defined it broadly, and focus on the value of the goods or services exchanged.  *See Leibowitz v. Parkway Bank & Trust Co.* (*In re Image Worldwide Ltd.*), 139 F.3d 574, 580 (7th Cir. 1998) ("reasonably equivalent value" is something more than consideration to support a contract); *see also Merrill v. Allen* (*In re Universal Clearing House Co.*), 60 B.R. 985, 1000 (D. Utah 1986) (when determining if "reasonably equivalent value" has been exchanged, the court will focus on the value of the services provided rather than on the impact that those services had on the bankrupt enterprise).

---

[27] Section 8-9A-3(b) does provide the following, which is not helpful in the instant case:

> For the purposes of ... subsection (a) of Section 8-9A-5, a person gives a reasonably equivalent value if the person acquires an interest of the debtor in an asset pursuant to a regularly conducted, noncollusive foreclosure sale or execution of a power of sale for the acquisition or disposition of the interest of the debtor upon default under a mortgage, deed or trust, or security agreement.

The record indicates that Holden contacted multiple lending institutions in Missouri on the Debtor's behalf, met with officials of Huntsville's Union Planters Bank in an effort to arrange credit for Debtor, helped the Debtor obtain performance bonds, and even guaranteed those performance bonds.[28]  In other words, RSN, acting through  Holden, performed services as promised in the consulting agreement.   This court agrees with the Bankruptcy Court's finding that services of reasonably equivalent value were exchanged for the consulting fees paid to RSN.

Based on the above, it is clear that the Bankruptcy Court did not err in entering summary judgment in favor of Holden and RSN on plaintiff's fraudulent transfer claim founded on Alabama Code § 8-9A-5.

> **3.    Plaintiff's preference claim based on 11 U.S.C. § 547(b)**

11 U.S.C. § 547(b) allows a trustee to set aside preferential transfers of a debtor's property, made on the eve of bankruptcy, in order to satisfy a preexisting debt.

> (b)    Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property —
>
> (1)  to or for the benefit of a creditor;

---

[28] Plaintiff's appendix to motion for summary judgment, Exhibit 1 (Holden deposition), at 46, 52, 53, 73, 74, 79-83, 92.

(2)   for or on account of an antecedent debt owed
      by the debtor before such transfer was made;

(3)   made while the debtor was insolvent;

(4)   made —

      (A)   on or within 90 days before the date of
            the filing of the petition; or

      (B)   between ninety days and one year before
            the date of the filing of the petition,
            if such creditor at the time of such
            transfer was an insider; and

(5)   that enables such creditor to receive more
      than such creditor would receive if —

      (A)   the case were a case under chapter 7 of
            this title;

      (B)   the transfer had not been made; and

      (C)   such creditor received payment of such
            debt to the extent provided by the
            provisions of this title.

11 U.S.C. § 547(b).

A preferential transfer[29] by a debtor is avoidable if made 90

days immediately preceding bankruptcy.  If the transfer is made to

an "insider" of the debtor, however, such transfer is avoidable if

made up to one year preceding bankruptcy.  The Debtor filed

---

[29] "Transfer" means every mode, direct or indirect, absolute or
conditional, voluntary or involuntary, of disposing of or parting with property
or with an interest in property, including retention of title as a security
interest and foreclosure of the debtor's equity of redemption.  11 U.S.C. §
101(54).

bankruptcy on May 21, 1998.  The loan proceeds were express mailed to RSN on July 10, 1997, in the form of a check.  That check was honored by Union Planters Bank on July 14, 1997.[30]  Therefore, in order to prevail on a preferential transfer claim, plaintiff must first establish that Holden and RSN were "insiders" as defined under 11 U.S.C. § 101(31).

### a.   Are defendants insiders?

Plaintiff's argument that defendants are insiders is based on two facts:  (1) under the terms of the stock transfer agreement, Holden held 50% of the Debtor's stock; and (2) Holden was named as a director in the Debtor's articles of incorporation.

The issue of whether a party is an insider is a mixed question of law and fact.  *See Ellenberg v. William Goldberg & Company, Inc. (In re Sullivan Haas Coyle, Inc.)*  208 B.R. 239, 242 (N.D. Ga. 1997).  Here, the Bankruptcy Court concluded that "Holden and RSN were not 'insiders' of the Debtor."[31]

The definition of an "insider" is found in Bankruptcy Code § 101(31), which provides in pertinent part that the term includes the following:

---

[30] Plaintiff's appendix to motion for summary judgment, Exhibit 2 (Bank statement, and check # 1124).

[31] Final Judgment of Bankruptcy Court, at 8 (¶ 2).

23

(B)   if the debtor is a corporation ——

    (i)    director of the debtor;
    (ii)   officer of the debtor;
    (iii)  person in control of the debtor....

. . .

(E)   affiliate, or <u>insider of an affiliate</u> as if such
    affiliate were the debtor....

11 U.S.C. § 101(31) (emphasis added). The term "affiliate," in

turn, is defined as follows:

(2)   "affiliate" means ——

    (A)   entity[32] that directly or indirectly owns
        controls, or holds with power to vote, 20
        percent or more of the outstanding voting
        securities of the debtor, other than an entity
        that holds such securities ——
    . . .
        (ii)  solely to secure a debt, if such entity
            has not in fact exercised such power to
            vote....

11 U.S.C. § 101(2).

The Bankruptcy Court concluded that RSN, <u>not</u> Holden, was the

recipient of the loans repaid on July 10, 1997, by means of a check

drawn on the account opened at Union Planters Bank by the LLC.

This court finds that determination was not clearly erroneous.

Because of this, it must be determined whether RSN satisfies the

---

[32] The term "entity" includes persons, estates, trusts, government units,
and United States Trustees.  11 U.S.C. § 101(15).

definition of an insider.  A perusal of § 101(31) makes it clear that the only way RSN can be deemed an insider is if it is found to be an "insider of an affiliate" under subsection (E).

Under this analysis, the court must first determine if Holden was an "affiliate."  Then, the court must ascertain if RSN can be deemed an "insider of an affiliate [Holden] as if such affiliate were the debtor."  11 U.S.C. § 101(31)(E).  This language requires the court to determine whether RSN would be deemed an insider if Holden were viewed as the debtor.

Applying § 101(31)(A)(iv) to the facts of this case clearly reveals that, if Holden were deemed the debtor, RSN would in turn be deemed an insider.  This section states that a corporation can be an insider to an individual if that person is the "director, officer, or person in control" of that corporation.  The evidence reveals that Holden indeed controlled RSN.  The Bankruptcy Court found that Holden is "a majority shareholder and officer of ... RSN Investments, Inc...."[33]   Holden's testimony supports this conclusion.  He testified that he formed RSN, was its president, and entered into many transactions on its behalf.[34]   Thus, the

---

[33] Final Judgment of Bankruptcy Court, at 2 (¶ 3).

[34] Plaintiff's appendix to motion for summary judgment, Exhibit 1 (Holden deposition), at 12-14, 62, 73-74.

evidence establishes that he was both an officer and person in control of RSN.  This determination means that if the court finds Holden to be an "affiliate," then RSN will be found an insider for purposes of avoiding preferential transfers under § 547.

### b.    Is Holden an affiliate?

The Bankruptcy Court concluded that "[t]he Stock Transfer Agreement constituted a security agreement under § 7-9-102 Code of Alabama, pursuant to which Holden was merely holding title to the stock of Cary and Thompson as collateral, rather than as an actual shareholder of the Debtor."[35]  If this conclusion was correct, then Holden would not be an "affiliate"; instead, he would fall into the exception which provides that a party who would otherwise be an affiliate — due to stock ownership or control with power to vote 20% or more of the outstanding voting securities of the debtor — will not be deemed such, if he holds such securities "solely to secure a debt, [and] if such entity has not in fact exercised such power to vote."  11 U.S.C. § 101(2)(A)(ii).

The stock transfer agreement itself sheds much light on the nature of this contract.  By its express terms, the agreement provided that Holden would become:

---

[35] Final Judgment of Bankruptcy Court, at 8 (¶ 1).

> the registered owner of 1,000 shares of stock in [the Debtor] with the understanding that 500 of said shares are to be transferred at closing to Noble [Thompson] and 500 shares are to be transferred at closing to Carey.[36]

"Closing" was expressly defined in the agreement as occurring when three events occurred:  First, when Holden was released on all of the Debtor's operating loans; next, when Holden was released from any liability incurred pursuant to any agreements of indemnity made by Holden to insurance companies with respect to guarantees of performance bonds; and finally, when Holden received assurance of the Debtor's compliance with its fee obligation to RSN under the consulting fee agreement.  Moreover, the agreement provided that any default on the terms of the agreement would result in extinguishing Thompson's and Carey's rights to have the stock transferred to them.

The testimony of Holden and the Principals reinforces the conclusion that the stock transfer agreement was intended to be a security agreement.  Holden testified that he held the stock "strictly for collateral purposes."[37]  Similarly, Hill testified that Holden was holding the 1000 shares "in escrow for Tommy Cary

---

[36] Appendix to appellees' brief, Exhibit 7 (stock transfer agreement), at ¶ 1(d).

[37] Plaintiff's appendix to motion for summary judgment, Exhibit 1 (Holden deposition), at 70.  *See also, id.* at 69, 85, 90.

27

and Noble Thompson."[38]   Likewise, Cary testified that Holden and the
Principals agreed that "Holden would take our shares of stock in
the company for security from us."[39]

Based upon the terms of the stock transfer agreement and the
testimony of the parties, the court concludes that this agreement
was a security agreement, rather than an absolute transfer of
Cary's and Thompson's stock to Holden.   Under Alabama Code § 7-9-
102(2), the provisions of Article 9 (relating to secured
transactions) apply to "security interests created by contract
including pledge[s], assignment[s] ... [and] other lien or title
retention contract[s] ... intended as security."   The evidence
reveals that the stock transfer agreement was intended to create a
security interest, "regardless of the form of the transaction or
the name by which the parties may have christened it." *Mattheiss
v. Title Loan Express (In re Mattheiss)*, 214 B.R. 20, 27 (Bankr.
N.D. Ala. 1997) (quoting from the Official Comment to § 7-9-102).

Plaintiff next argues that, upon default of the terms of the
stock transfer agreement, Holden became a 50% shareholder of the
Debtor and, thus, exercised the rights of a shareholder.[40]   The

---

[38] *Id.*, Exhibit 6 (Hill deposition), at 36.

[39] Appendix to appellees' brief, Exhibit 2 (Cary deposition), at 22.

[40] Appellant's brief (doc. no. 2), at 18.

28

court finds this argument is without merit.  Holden threatened to foreclose on the Principals' stock in the Debtor on May 15, 1997; Holden never implemented that threat, however.  As further evidence that Holden did not become owner of the Debtor, Holden did not participate in any manner in the Principals' attempt to obtain a rate increase from the SDVA during June of 1997.  Moreover, Holden did not attend any meetings of the Debtor's shareholders or directors.  Also, Carey, Thompson, and Hill continued to control the Debtor's operations following receipt of Holden's demand letter.  Furthermore, Holden was never consulted regarding the decision to file bankruptcy on behalf of the Debtor in 1998.  As the Bankruptcy Court inquired of the plaintiff's representative, "how can you have it both ways?  If Holden held 100 percent of the stock,[41] as you would argue, then how can [the Debtor] get put into bankruptcy without any consultation from him?"[42]

Finally, "[a] debt instrument listing stock as collateral, with no special provision providing for disposition of the attendant voting rights upon default, will generally confer upon

---

[41] Fifty percent of the stock allegedly coming from default under the pledge agreement with Hill, and the remaining 50% coming from default of the stock transfer agreement.

[42] Transcript of hearing on motions for summary judgment, September 22, 1999, at 14.

the creditor only the right to sell or otherwise liquidate the stock." *In re Windham Power Lifts Inc.*, 91 B.R. 595, 598 (Bankr. M.D. Ala. 1988). The stock transfer agreement did not give Holden the power to vote the Debtor's stock, and even after default of the agreement the assignors (the Principals) continued to run the business of the Debtor. They even guided it into bankruptcy without the consent of, or prior discussion with, Holden. Based upon the above, the court concludes that the stock transfer agreement, and the subsequent default of its terms, did not render Holden an affiliate.

Having determined that Holden is not an affiliate under § 101(2), it follows that RSN cannot be deemed an insider of an affiliate under § 101(31). Because RSN is not an insider, it follows that there is no basis for plaintiff to assert that RSN was the recipient of an avoidable preferential transfer under 11 U.S.C. § 547. Thus, the Bankruptcy Court's decision on plaintiff's preferential transfer claim is affirmed.

In its brief, plaintiff also argues that Holden is an insider due to his being named a director of the Debtor in its articles of incorporation. As noted above, however, the Bankruptcy Court determined that RSN, <u>not</u> Holden, received repayment of the loan proceeds. As such, Holden's status as a director of Debtor is not

30

determinative of the issue of whether the loan proceeds sent to RSN

constituted a preferential transfer.  Even it were, the court notes

that Holden's lack of participation in any meaningful manner could

lead to the conclusion that he was not an insider, despite his

title as director.  *See Sims Office Supply, Inc. v. Ka-D-Ka, Inc.*

(*In the matter of Sims Office Supply, Inc.*), 94 B.R. 744, 747

(Bankr. M.D. Fla. 1988) (despite the alleged insider's title of

president of debtor, his lack of control and participation forced

the conclusion that he was not an insider under § 101(31)); *see*

*also NMI Systems, Inc. v. Pillard* (*In re NMI Systems, Inc.*) 179

B.R. 357, 369 (Bankr. D.C. 1995) (officer of debtor corporation not

an insider despite title, due to his lack of active participation

in management of debtor).

### 4.   Did Holden owe, or breach fiduciary duties owed to, the unsecured creditors of the Debtor?

Plaintiff finally argues that Holden breached his fiduciary

duties as a director by "milk[ing]" the Debtor "for preferential

transfers at a time of financial distress."[43]  This court, like the

Bankruptcy Court, disagrees.

"For many years, [the Alabama Supreme Court] has recognized

the principle that a failing debtor who is unable to pay all of his

---

[43] Appellant's brief (doc. no. 2), at 23.

31

debts may choose which creditors to pay, even though the payments may prevent the debtor from paying anything to other creditors." *Cooper v. Ken Hilton Ford Sales, Inc.*, 486 So. 2d 424, 425 (Ala. 1986).  Moreover, the Alabama Supreme Court has observed that:

> At common law, the settled rule in this state allowed an insolvent corporation to make a transfer of its assets to one or more of its directors in payment of bona fide debts due from the corporation, thereby preferring such directors to other creditors in payment of its corporate debts.

*View-All, Inc. v. United Parcel Service*, 435 So. 2d 1198, 1202 (Ala. 1983) (citing *Corey v. Wadsworth*, 25 So. 503 (Ala. 1897)).

Plaintiff has cited no applicable state law indicating that such a transfer was a breach of a fiduciary duty.  Therefore, this court finds that the Bankruptcy Court correctly granted summary judgment on plaintiff's breach of fiduciary duty claim.

## IV. CONCLUSION

For the foregoing reasons, this court concludes that the judgment of the Bankruptcy Court is due to be affirmed.  An order consistent with this memorandum opinion shall be entered contemporaneously herewith.

DONE this __17th__ day of November, 2000.

_____
United States District Judge

32